SOUTHERN CROSS INDUSTRIES,
INC., Appellant,

v.

Landon C. MARTIN, Harry R. Morgan
and Daniel R. Forestier, Appellees.

No. 16337.

Court of Civil Appeals of Texas,
San Antonio.

June 30, 1980.

Rehearing Denied Sept. 3, 1980.

Theo F. Weiss, San Antonio, for appellant.

Tuck R. Chapin, J. Aubrey Flowers, Stanley Bernstein, San Antonio, for appellees.

OPINION

MURRAY, Justice.

Landon C. Martin and Harry R. Morgan, appellees, brought this action against their former employer, Daniel N. Forestier, and Southern Cross Industries, Inc. (Southern Cross), a Georgia corporation based in Atlanta, for part of a real estate commission allegedly earned by Forestier. Appellee Forestier filed a crossaction against Southern Cross, appellant, for the remainder of the commission.

On December 4, 1970, Southern Cross and Forestier entered into a listing agreement, which gave Forestier the exclusive right to sell certain property located in San Antonio, Texas, for a period of 180 days. The property was described in the listing agreement as the Reliance Engineering and Manufacturing Company (REMCO). The REMCO plant was a subsidiary of Southern Cross, which had recently been closed by the parent company. The agreement provided that Southern Cross would accept any price down to $425,000 in cash to be paid at closing. Upon producing a purchaser ready, willing and able to buy the property at an acceptable price, the broker was entitled to a commission of six per cent of the first

$100,000 of the sales price and five per cent of all monies above the first $100,000 of the sales price. Paragraph four provides that if the property is sold within twenty–four months from the date of the agreement to a prospective purchaser procured by the broker, the broker is entitled to a commission if he has notified the owner, in writing, within ten days following the expiration of the contract, of the name and address of all of the prospective purchasers. Both Martin and Morgan alleged that they are licensed real estate salesmen and that they were employed by Forestier. Appellee Morgan further alleged that pursuant to an employment agreement entered into with Forestier he was to receive ten per cent of any commission for his services in obtaining an exclusive listing agreement from Southern Cross. Martin also alleged that pursuant to an employment agreement entered into with Forestier, he was entitled to forty–five per cent of the commission received by Forestier.

At trial Southern Cross introduced into evidence a proposed earnest money contract dated May 11, 1971, and signed by Forestier, which in effect provided for the sale of the property to Forestier for $225,000. By letter dated May 19, 1971, Southern Cross rejected Forestier's offer stating: "We return to the original price range of $425,000 to $500,000 as being acceptable." On May 12, 1971, Martin showed the property to several representatives of Dunlap Sales and Services Corporation (Dunlap). After touring the plant, Kenneth J. Foulk, the vice–president of Dunlap, expressed an interest in the property and asked Martin to call him the following morning and quote the lowest price that Southern Cross would agree to. The next day when Martin called Foulk to tell him that $425,000 was the lowest acceptable selling price, Foulk suggested that they draw up an earnest money contract. That same day Martin and Forestier met Foulk and two other Dunlap officials. At the meeting Foulk mentioned that due to some tax problems, Dunlap might not be able to buy the property until later in the year. Nevertheless, he accepted the offer of $425,000 and suggested that the

parties reduce their agreement to writing. Martin thereupon typed up an earnest money contract that provided for the sale of the property by Forestier, as seller, and Dunlap, as purchaser. The price was stated to be the "agreed price" and the agreement further provided that it was to be superseded by a contract acceptable to both parties and approved by the parties' attorneys. Martin testified that after the execution of the agreement a $5,000 earnest money check was given to Forestier by Foulk, made out to Forestier's escrow account.

On May 18, 1971, Mr. J. Brittain Pendergrast, Jr., the president of Southern Cross, notified Forestier that the 180–day exclusive listing agreement would be considered terminated by Southern Cross at the expiration of its term on June 2, 1971. Shortly after this notice was sent, Forestier offered to purchase the property for $375,000 cash to be paid on closing. Southern Cross orally accepted this offer and drafted a sales contract, embodying the terms agreed upon over the telephone and setting the closing date for July 1, 1971. On May 26, 1971, Forestier, as lessor, and Dunlap, as lessee, entered into a lease agreement covering the REMCO property. The term of the lease was fifteen years, and provided for a total rental of $765,000, payable in monthly installments of $4,250. The agreement gave Dunlap the option to purchase the property on or before December 31, 1971, for $425,000.

On May 31, 1971, Forestier sent Southern Cross a list of prospective purchasers in accordance with paragraph four of the listing agreement. Included in the list of potential buyers of the property was Dunlap Sales and Services Corporation. Shortly thereafter Forestier indicated to Pendergrast that he was having trouble raising the money for the purchase of the property and that he might be unable to tender $375,000 by July 1, the agreed upon closing date. Pendergrast testified that he told Forestier he would consider a modification of the sales contract allowing Forestier more time to raise the purchase money. Although the precise date is unclear from the record, it

appears that shortly after this conversation a former employee at the REMCO plant, who had been retained to look after the property, called Pendergrast in Atlanta to express some concern about the property. He related that the locks had been changed and that equipment belonging to Dunlap was being moved onto the premises. Pendergrast testified that this was the first time he had heard the name Dunlap and that Forestier had not disclosed to Southern Cross that Dunlap was a potential buyer. He further testified that Forestier expressed an interest in buying the property himself on a speculative basis, indicating that there was no potential purchaser.

Subsequently, Pendergrast initiated a meeting with Forestier and the Dunlap people for the purposes of discussing the terms of Forestier's proposed modification of the $375,000 sales contract, and to investigate the reported developments at the REMCO plant. Present at the June 14 meeting were Forestier and Martin, Pendergrast and two other Southern Cross officials, and two representatives of Dunlap. After the usual pleasantries were exchanged Pendergrast announced that Southern Cross was not willing to modify the sales contract with Forestier and would insist on compliance with the terms of the contract providing for cash to be paid on closing. An altercation ensued between Forestier and Pendergrast and the meeting ended abruptly when Forestier was restrained by others present.

The next day, after the Southern Cross group had returned to Atlanta, Pendergrast was contacted by officials from Dunlap. Although the parties immediately began negotiating the terms of the sale of the property, Pendergrast insisted that no agreement could be entered into until July 2, 1971, since Southern Cross was obligated to sell the property to Forestier if he tendered $375,000 on July 1. At a meeting with counsel for Southern Cross on July 1, 1971, Forestier acknowledged that he was unable to raise the money required to close the sale. Subsequently, in September of 1971 the REMCO property was sold to Dunlap for $425,000.

Martin and Morgan allege that they are entitled to commissions under their employment agreements with Forestier and the exclusive listing agreement between Southern Cross and Forestier. In his cross–action Forestier alleges that he is entitled to a commission as provided for in the listing agreement with Southern Cross. The trial court rendered judgment for Martin and Morgan against Forestier and Southern Cross in the amounts of $10,012.50 and $2,225, respectively. The court also awarded Forestier $10,012.50 in his cross–action against Southern Cross. It is from this judgment that Southern Cross has perfected an appeal.

By numerous points of error the appellant contends that Forestier, as broker, owed a fiduciary duty to Southern Cross which was breached when he sought to buy the REMCO property without disclosing all of the material facts and circumstances surrounding the transaction. Southern Cross argues that this breach precludes Forestier from recovering any compensation for his services, and asserts that the breach also bars any recovery by Martin and Morgan since they are entitled to compensation only if Forestier is. We agree with these contentions.

■ The relationship between a seller of property and his real estate broker is fiduciary in nature, as is the relationship between principals and agents generally. *Anderson v. Griffith*, 501 S.W.2d 695, 700 (Tex.Civ. App.—Fort Worth 1973, writ ref'd n. r. e.). Consequently, when a real estate broker is retained to sell another's property he becomes obligated to procure for the seller the best price possible for the property. *See Burleson v. Earnest*, 153 S.W.2d 869, 874 (Tex.Civ.App.—Amarillo 1941, writ ref'd w. o. m.).

■ A conflict arises, however, when a real estate broker undertakes to buy the seller's property on his own behalf. In his capacity as agent he is duty–bound to sell at the highest price obtainable, while, as a purchaser he is predisposed to procure the property at the lowest price possible.

Recognizing this conflict, the law takes a dim view of any transaction in which a real estate broker acquires an interest in the seller's property, and requires the agent to disclose to his principal all facts that would reasonably affect the principal's judgment. *See id.* at 874; *Ramsey v. Gordon*, 567 S.W.2d 868, 871 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.).

Pendergrast's testimony that Forestier never disclosed to him Dunlap's offer to purchase the REMCO property for $425,000 is undisputed. Forestier's testimony that he informed Pendergrast of Dunlap's desire to lease the property, even if true, is no evidence that he notified Southern Cross of Dunlap's interest in purchasing the property.[1]

■ We hold that Dunlap's expressed desire to purchase the REMCO property was a material fact, which would have reasonably affected Southern Cross' decision to sell the property to Forestier for $375,000, had Southern Cross been informed of Dunlap's interest. The failure of Forestier to make this disclosure was a breach of his fiduciary duty precluding him from recovering any compensation for his services. *See Russell v. Truitt*, 554 S.W.2d 948, 951–52 (Tex.Civ. App.—Fort Worth 1977, no writ).

Since Martin and Morgan are entitled to compensation only if their former employer, Forestier, is, our holding that Forestier breached a fiduciary duty owed to the appellant precludes appellees Martin and Morgan from recovering any compensation from Southern Cross.

In view of our holding we consider it unnecessary to discuss appellant's other points of error. The trial court's judgment is reversed; judgment is here rendered for the appellant, Southern Cross Industries, Inc.

---

1. Nor is Forestier's testimony that "[e]verybody knew" [what was going on] evidence that Southern Cross was informed of Dunlap's desire to purchase the property. When placed in its proper context it is clear that this statement was in response to a question inquiring whether Pendergrast knew of Dunlap's interest in leasing the property.