TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00625-CV






Appellants, Toni Diane Compton and Johnny Compton//Cross-Appellant, Mary Sesso 



v.



Appellee, Mary Sesso//Cross-Appellees, Toni Diane Compton and Johnny Compton







FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT

NO. B-03-0782-C, HONORABLE RAE LEIFESTE, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 This appeal concerns whether Toni Diane Compton committed a breach of fiduciary
duty and fraud against her mother, Mary Sesso, and whether Toni Compton's husband, Johnny
Compton, acted in a way that renders him liable for any or all of the alleged fraud. Mary Sesso sued
the Comptons, (1) and after a nonjury trial, the court determined that (1) Toni Compton committed
fraud and constructive fraud against Mary Sesso and (2) Johnny Compton knew or should have
known of the fraud and he accepted some of the benefits from it. Accordingly, the court awarded
Mary Sesso $72,448.24 in actual damages against Toni Compton and held Johnny Compton jointly
and severally liable for $26,244.60 of that amount. The court also assessed $15,000 in exemplary
damages against Toni Compton. On appeal, the Comptons challenge the sufficiency of the evidence
to support the judgment. By cross-appeal, Mary Sesso contends that the court erred by limiting
Johnny Compton's liability. She requests that we reform the judgment to hold him jointly and
severally liable for the entire judgment. We will affirm the judgment.


BACKGROUND


 Toni Compton's parents, Mary and Tony Sesso, (2) lived in a house they owned in Del
Rio. The Sessos had a strained relationship with their daughter, Toni Compton. Mary Sesso testified
that she and her husband changed their will, directing that their estate be divided equally among their
three children, but that Toni Compton's share would pass to their grandson, Lynn Compton.

 Mary Sesso testified that, in 2002, Toni Compton persuaded her parents to sell the
house and move to an apartment in San Angelo so that she could care for them. In early September
2002, the Sessos received a check for $76,127.22 from the sale of the house. Toni Compton drove
her parents to Del Rio to complete the transfer of keys and to cash the check. The Sessos used
$2,577.97 of the funds for a cashier's check to pay a debt to a furniture store and took the remainder
in cash in two bank pouches. A letter prepared in 2003 by the Del Rio bank recites that the Sessos
received $73,549.25--$53,500 in $100 bills, $20,000 in $50 bills, two $20 bills, one $5 bill, four
$1 bills, and a quarter.

 On September 11, 2002, the Sessos and Toni Compton opened a safe deposit box at
the San Angelo bank where Toni and Johnny Compton had their accounts. (3) Mary Sesso testified that
she and her husband let Toni Compton sign the box agreement because Toni Compton wanted access
to the box in case of an emergency. Mary Sesso testified that they put all of the cash they received
from the Del Rio bank into the safe deposit box. Mary Sesso testified that her husband wanted to
keep the money at home. The Sessos had a fixed income of just over $1100 per month and intended
to use the cash only for extraordinary or emergency expenditures.

 Mary Sesso testified that she kept both of the keys to the safe deposit box in their
original envelopes hidden in her jewelry box in her husband's drawer. She told Toni Compton
where the keys were in case of emergency. Mary Sesso testified that Toni Compton delivered
groceries to their apartment every Friday and went unsupervised into various areas of the apartment. 
Mary Sesso testified that she did not authorize anyone to open the safe deposit box and did not know
that anyone had opened it. She testified that she knew that her husband did not authorize anyone to
take funds from the box because he would have told her if he had. 

 Mary Sesso testified that she did not attempt to open the box until she needed funds
to pay for her husband's funeral in June 2003. At that time, she looked for the keys to the box but
found only the empty envelopes in her jewelry box. Toni Compton claimed ignorance when asked
where the keys were. Mary Sesso testified that, after she explained that she needed to go to the bank
in the morning to get the money, Toni Compton told her "you better be early."

 Toni's son, Lynn Compton, accompanied Mary Sesso to the bank the next morning. 
After the box was drilled open by a locksmith, they discovered that most of the cash was missing. 
One of the bank pouches contained only a penny. The other contained about $1100 in bundles. Each
of the bundles had $100 bills on the outside but were filled with $1 bills. According to photographs
taken several days later of the labels binding the bundles, the bundles each contained a hundred
single bills. One of the bundles of bills was stamped as being from the San Angelo bank on October (4)
15, 2002.

 San Angelo bank employee Rebecca George supervised several events involving the
safe deposit box. She had rented the box to the Sessos and Toni Compton in September 2002. She
had assisted (5) Toni Compton in opening the box on October 15, 2002. George also viewed the
contents of the box on June 13, 2003, at Lynn Compton's insistence about two minutes after the box
was opened. George testified that Mary Sesso and Lynn Compton were very upset after viewing the
contents of the box and ended the rental within minutes. Bank records showed that Toni Compton
had also opened the box on November 13, 2002 and April 15, 2003. There is no record of anyone
else opening the box at any other time.

 Lynn Compton testified that, after learning his mother had previously opened the box,
he called to speak to her. He testified that Johnny Compton, his stepfather, told him that Toni
Compton was busy, but that he heard his mother screaming, "Whatever he's saying, he's lying." 
Lynn Compton testified that the Comptons had made several purchases after September 2002,
including a new wooden floor, new furniture, a cement mixer, a barn, a stove, a water purification
system, a redwood deck, and a Suburban with leather interior. He testified that Johnny Compton
said that the Suburban payments were $480 per month. Lynn Compton described his relationship
with his grandparents as very good, saying that he visited them often. He testified that he may have
been at their apartment in September 2002 when they returned from Del Rio with the cash. He also
testified that, since September 2002, he had bought both a new home (with no downpayment because
of his disabled veteran status) and a new car, both with financing.

 Toni Compton said that her relationship with her father was very good but that her
relationship with her mother was only fair. Toni Compton testified that her parents were looking to
move from Del Rio in part because of a disagreement with their daughter-in-law, who also lived in
Del Rio. Toni Compton said that her parents liked the apartment that Johnny Compton's mother had
in San Angelo and investigated various retirement communities in that city.

 Toni Compton testified that, although her parents were encouraged to invest the
proceeds of the house sale, her mother insisted on keeping the funds in cash. She testified that her
mother held the cash overnight before they opened the safe deposit box. Toni Compton testified that
she could not be sure how much money was actually placed in the box. Because Mary Sesso
requested that something other than cash be put in the box, Toni added two strands of pearls. She
testified that Mary Sesso gave her one of the safe deposit keys in September 2002 when they rented
the box.

 Toni Compton explained that, in accord with her father's wish, she took $30,000 in
cash from the box on October 15, 2002, to purchase the Suburban. She said that she discussed the
purchase with her father in front of her son, but not her mother. Toni Compton testified that her
father said he wanted to make sure that she got something from him in case Mary Sesso changed
their will again. Toni Compton testified that her father knew the price range of the vehicle and knew
she took the cash. While taking the $30,000 from the box, she also removed her pearls. Evidence
showed that, in mid-October 2002, Toni Compton deposited $26,000 into her and Johnny Compton's
checking account and wrote a $26,244.60 check for the Suburban.

 Toni Compton testified that her remaining visits to the safe deposit box involved only
the pearls. She replaced them in November 2002 and removed them in April 2003. She testified that
she saw the cash bags in the box but did not examine their contents or remove any money. She
testified that she did not remove any more money, change the bands on the money, or open the box
at any other time. She claimed to not know what happened to the rest of the money.

 Toni Compton testified that some of the purchases her son described were old
purchases and that the money for other recent home improvements came from her occasional
employment, their income tax refund, her husband's bonus pay, and their savings. She testified that
the cement mixer cost around $100 and that the water filtration system was only partly paid for. She
said they paid about $5500 for the metal barn/workshop from her husband's bonus. She testified that
the furniture was several years old as were some other purchases. Toni Compton also testified that
her father had given her $2000 to complete a project to weather-proof the house and to prevent rats
from getting underneath the house. 

 Johnny Compton testified that he did not participate in the critical events. He sat at
the table during the discussion about the disposition of the house sale proceeds and said at trial that
he recommended investment, but Mary Sesso rejected the idea in favor of keeping the cash available. 
He testified that he had no involvement with the safe deposit box and did not participate in
prepurchase discussions about the Suburban. He claimed that he drove the Suburban occasionally,
but only in his wife's company. He flatly denied telling anyone that he was making a payment on
the Suburban, much less stating the amount. He testified that the redwood deck was about five years
old and was paid for with income tax money. He said that the wooden floor was paid for by an
income tax refund and his bonus. Johnny Compton testified that, in addition to working for Verizon
as a manager of outside plant construction, he raised and sold goats. He estimated that they netted
about $3500 from the goats in 2002 and that the funds were put in a separate ranch bank account to
be used for more goat-related expenses.

 Johnny Compton testified that they had three bank accounts: the ranch account, a
checking account, and a savings account. He and his wife shared the accounts, putting their income
into the joint checking account and paying for household expenses from that account. He could not
explain where money for deposits in the joint accounts during the early months of 2003 came from
when his wife was not working, but speculated that it could have come from goat sales. He said that
both he and his wife balance the checkbook.

 Johnny Compton testified that Mary Sesso told him that his wife had a key to the safe
deposit box for emergencies. He also knew that Toni Compton opened the box to get the cash for
the vehicle and to retrieve and replace jewelry, but could not remember the exact dates.

 The trial court found that Toni Compton had a fiduciary relationship with her mother
and breached her responsibilities, committing fraud and constructive fraud, by taking cash from the
safe deposit box. The court found that Johnny Compton knew or should have known about that
fraud but accepted the benefits of it. The court assessed actual damages of $72,448.24 against Toni
Compton for the amount missing from the box, plus pre- and post-judgment interest. The court
assessed exemplary damages against Toni Compton. The court placed a constructive trust on the
Suburban, which was undisputedly purchased with funds from the box. The court also found Johnny
Compton partly culpable for knowledge or participation in the fraud, and held him jointly and
severally liable for the price paid for the Suburban, $26,244.60. On appeal, the Comptons challenge
the damage awards against them, while Mary Sesso challenges the limitation of the actual damages
award against Johnny Compton.

 Specifically, the Comptons challenge the trial court's findings and conclusions that
(1) they used $28,133.60 from the safe deposit box to purchase a Suburban, which was placed in
Toni Compton's name and used by both Comptons as a family vehicle, (2) Johnny Compton
benefitted from the purchase and use of the Suburban, (3) Johnny Compton knew or should have
known that Toni Compton stole funds from Mary Sesso, (4) Toni Compton committed fraud and
constructive fraud against Mary Sesso, (5) by accepting the benefits of Toni Compton's fraud,
conversion, and theft, Johnny Compton participated in these acts, (6) the Comptons would be
unjustly enriched if the Suburban remained in Toni Compton's name, and (7) Johnny Compton is
jointly and severally liable for $26,244.60 of the $72,448.24 principal judgment. Mary Sesso argues
by cross-appeal that Johnny Compton should be jointly and severally liable for the entire amount of
the judgment, rather than just a portion of it.


ANALYSIS

 The Comptons contest the factual sufficiency of the evidence that Toni Compton
committed a breach of fiduciary duty or fraud against Mary Sesso. They also challenge the
sufficiency of the evidence to support the damage amount. They cite gaps in evidence about the
amount of money placed in the box and times during which other people had access to the money. 
They point to evidence that the Sessos kept the money overnight before renting the box and that
Lynn Compton was at his grandparents' apartment that night.

 We review findings of fact by the court in the same manner as we view jury findings.
Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Ludwig v. Encore Med., L.P.,191 S.W.3d 296, 300
(Tex. App.--Austin 2006, no pet.). When reviewing a challenge to the factual sufficiency of the
evidence, we must consider, weigh, and examine all of the evidence in the record. Plas-Tex, Inc. v.
U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the verdict only if the
evidence that supports the finding is so weak as to render the judgment clearly wrong and manifestly
unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse even if we would
find that the evidence preponderates toward a different answer. See Herbert v. Herbert, 754 S.W.2d
141, 144 (Tex. 1988). In a bench trial, the trial court, as fact-finder, is the sole judge of the
credibility of the witnesses. Buffington v. DeLeon, 177 S.W.3d 205, 209 (Tex. App.--Houston [1st
Dist.] 2005, no pet.). We may not pass upon the witnesses' credibility or substitute our judgment
for that of the fact-finder. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998). 
But see City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005) (jurors cannot substitute their
opinions for undisputed truth).

 Breach of a fiduciary relationship can constitute fraud because the fiduciary
relationship imposes higher duties, such as duties of good faith, candor, and "full disclosure
respecting matters affecting the principal's interests and a general prohibition against the fiduciary's
using the relationship to benefit his personal interest, except with the full knowledge and consent of
the principal." Flanary v. Mills, 150 S.W.3d 785, 795 (Tex. App.--Austin 2004, pet. denied)
(quoting Chien v. Chen, 759 S.W.2d 484, 495 (Tex. App.--Austin 1988, no pet.)). At common law,
the term "fraud" means an act, omission, or concealment in breach of a legal duty, trust, or
confidence justly imposed, when the breach causes injury to another or the taking of an undue and
unconscientious advantage. Chien, 759 S.W.2d at 495. Common-law fraud includes both actual and
constructive fraud. Actual fraud usually involves dishonesty of purpose or intent to deceive. Archer
v. Griffith, 390 S.W.2d 735, 740 (Tex. 1964). Constructive fraud encompasses those breaches that
the law condemns as fraudulent because they tend to deceive others, violate confidences, or cause
injury to public interests, regardless of the actor's mental state. Id. When one has a duty to speak
the truth, a false representation of a past or present material fact is fraudulent when another relies
thereon to his detriment. See Chien, 759 S.W.2d at 495.

 Appellants do not challenge that there was a fiduciary relationship between Mary
Sesso and Toni Compton. They argue that gaps exist in the evidence regarding how much money
was placed in the safe deposit box and who might have taken the money. We conclude, however,
that sufficient evidence supports the court's findings that Toni Compton breached her fiduciary
obligations to Mary Sesso by taking more than $70,000 in cash without permission. The undisputed
evidence is that the Sessos received $73,549.25 in cash from the Del Rio bank, and that Mary Sesso
put the full amount in the box. The evidence reflects that Toni Compton was the only person who
accessed the box before June 2003. She admitted taking $30,000 in cash during the October 2002
visit, and there is evidence indicating that the cash remaining in the box was rebound at that time
with $1 bills used to fill out the bundles. In addition to the evidence that Toni Compton tried to
conceal her removal of funds, when her son called to confront her about the missing funds, there is
evidence that Toni Compton shouted to her husband that her son was lying. Toni Compton claimed
to have her father's permission to take the $30,000, and denied knowledge of what happened to the
remaining $40,000. There was disputed evidence regarding whether the Comptons made several
large purchases between September 2002 and June 2003 that were inconsistent with their resources. 
The Comptons speculated that Mary Sesso originally placed less than the full amount in the box and
that someone else--perhaps Mary Sesso or Lynn Compton--removed the money. The trial court
made a credibility decision and chose to credit Mary Sesso's and Lynn Compton's version of events. 
The record does not support overturning that decision. We conclude that sufficient evidence
supports the findings that Toni Compton committed fraud through breach of fiduciary duty.

 Both sides challenge the court's conclusion that Johnny Compton is jointly and
severally liable for the fraud to the extent that it involves the purchase of the Suburban. The court
concluded that Johnny Compton knew or should have known that Toni Compton had taken money
from the box without permission and that, because he benefitted from her wrongful taking of those
funds, he equitably participated in that wrongdoing. The Comptons contend that Johnny Compton
had almost no involvement in any of the relevant transactions and that he did not benefit from the
purchase of the Suburban. Conversely, Mary Sesso contends that Johnny Compton should be held
liable for all of the missing cash.

 A party who benefits from a fraudulent transaction may be a principal in the
fraud and may be held liable as such. In re Arthur Andersen L.L.P., 121 S.W.3d 471, 481
(Tex. App.--Houston [14th Dist.] 2003, no pet.). A party can be liable for the fraudulent
misrepresentations of a third party by mere silent acquiescence when he benefitted from the fraud. 
Id. (citing Bransom v. Standard Hardware, Inc., 874 S.W.2d 919, 924 (Tex. App.--Fort Worth
1994, writ denied); Corpus Christi Teachers Credit Union v. Hernandez, 814 S.W.2d 195, 202 (Tex.
App.--San Antonio 1991, no writ)).

 There is evidence that supports the court's findings that Johnny Compton was aware
of the fraud and knowingly benefitted from it. The connection between the cash removed from the
box and the purchase of the Suburban is undisputed. Johnny Compton benefitted by using it on the
weekends with his wife. Although flatly denied, Lynn Compton's testimony that Johnny Compton
said he was making payments on the Suburban is inconsistent with the idea that it was a fully-paid
gift. Even if Johnny Compton was initially unaware that the purchase money for the Suburban was
not a gift, he became aware on June 13, 2003, that others did not believe it was a gift. Factually
sufficient evidence supports the trial court's findings that Johnny Compton accepted the benefits of
Toni Compton's fraud despite his awareness of the fraud.

 Nevertheless, the evidence also supports the court's judgment limiting Johnny
Compton's liability to the purchase price of the Suburban. Unlike the clear evidence connecting the
$30,000 taken by Toni Compton with Johnny Compton's beneficial use of the Suburban, there is not
sufficient evidence to establish a clear connection between the remainder of the cash taken by Toni
Compton (approximately $40,000) and a particular benefit received by Johnny Compton. There was
testimony that the Comptons purchased several assets and improvements while Toni Compton had
access to the box, but there was competing evidence that the purchases were made at other times or
with other funds. Further, there is no direct evidence that Johnny Compton participated in his wife's
deceptive actions. The only evidence is of peripheral involvement in events surrounding the cash,
such as his presence at the meeting when the funds were discussed and his awareness of the deposits
made by Toni Compton between September 2002 and June 2003, at times when she had access to
the box and was not otherwise earning an income. Yet, it is undisputed that Johnny Compton did
not rent the safe deposit box, was not an authorized user, and did not open it. Thus, factually
sufficient evidence supports the court's refusal to find that Johnny Compton benefitted from the
remainder of the removed cash and that he knew of or acquiesced in that benefit. Accordingly, the
record supports the court's refusal to hold Johnny Compton jointly and severally liable for anything
more than the value of the Suburban.


CONCLUSION


 Having resolved all issues presented in favor of the judgment, we affirm the
judgment.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: July 21, 2006

1. The term "the Comptons" refers to Toni Compton and Johnny Compton but does not
include Toni Compton's son, Lynn.
2. Toni Compton's father, Tony Sesso, is now deceased. 
3. Mary Sesso testified that they cashed the check and rented the safe deposit box on the same
day. When the defense pointed out that the respective bank documents indicated the events occurred
on consecutive days, Mary Sesso said she believed the dates shown on the documents were
erroneous. She said that, in any event, if a night passed between cashing the check in Del Rio and
placing the money in the rented box in San Angelo, Toni Compton had possession of the cash during
that time.
4. Sesso testified that the bundle was stamped "October," yet she no longer had the wrappers
by the time of trial. The part of the stamp showing the month is not visible in the photographs of the
bundles, although the day, year, and the San Angelo bank's name were visible.
5. George testified that the safe deposit boxes open with the use of two keys--a "guard key"
used by a bank employee and the customer's key.